Good morning. My name is Keenan Levine. I represent the petitioner and appellant Joshua Seth Romero. We would like to reserve a few minutes for rebuttal, but I'll pay attention to the clock. Counting down. Okay. Your Honors, Joshua Romero was 16 years old when he was convicted of first-degree manslaughter and the state firearm enhancement in the tragic death of his 15-year-old sister. The most critical issue that I believe is presented for review today, and which I'd like to focus on, is issue number one that we set out in our brief, which involves the fact whether defense counsel at trial provided an effective assistance to counsel when the language of the excusable homicide instruction that he submitted, and which was accepted by the trial court, in fact made it impossible for two things to happen. One, for the jury to find that Joshua had committed the lesser crime of second-degree manslaughter, which defense counsel had proposed and which was before the jury. And whether that same instruction also made it impossible for the jury to find that an excusable homicide had occurred at all, and therefore made it impossible for them to acquit Joshua of either first-degree manslaughter or second-degree manslaughter. Was it the instruction or was it the stipulation and the instruction? It was the stipulation and the instruction with regard to the issue of whether or not he could be acquitted on manslaughter one and manslaughter two. Because there, in fact, the instruction stated that for it to be an accident or excusable homicide, it had to have been committed by a lawful act with lawful means. And clearly, defense counsel at trial admitted, conceded in front of the jury, as opposed to, say, having him plead guilty beforehand and asking the court to, in a motion in limine, preclude the jury from hearing about the possession of a firearm in the first-degree charge. That charge stood, and he conceded that. And we have argued, quite frankly, it's simply impossible for it to be a lawful act done by lawful means, the accident, if you are prohibited by law from possessing a gun and shooting it. Counsel, this could have come in through testimony, could it not, if it hadn't been stipulated to? If, in fact, the charge was before the jury. If, in fact, the charge was still present before the jury. I mean, if defense counsel wanted to concede the possession of a firearm, the felon in possession of a firearm in the first-degree, they could have just pled guilty to it. I mean, it didn't have to be before the jury. Well, the question is whether this evidence could have come in before the jury. Could it or couldn't it? I think that is an open question. I think it might not have. On what basis? Pardon me? On what basis could it have been excluded? Well, it could have been more prejudicial than probative under Evidence Rule 403. Clearly, it could have been kept out from that. But I think what's even more important, Your Honors, and which, frankly, has been ignored by the state courts and it was ignored by the district court in this case, is how this issue pertains to the lesser-included offense of manslaughter in the second-degree. Because there, the critical language in the instruction isn't necessarily, I mean, it's part of it, but it isn't necessarily the issue of accident or misfortune, doing any lawful act by lawful means. It's the fact that the instruction states, in pertinent part, homicide is excusable when committed by accident or misfortune and doing any lawful act by lawful means without criminal negligence. The crime of second-degree manslaughter in Washington is committed with the mental state of criminal negligence. So if you have an excusable homicide instruction or accident instruction that says it's not available to you, unless it's committed without criminal negligence, how in the world could the jury ever find a defendant like Joshua guilty of only the lesser-included crime of second-degree manslaughter? The instruction, the language of the instruction, completely negates the possibility of him being able to be found not guilty of second-degree manslaughter. Just a minute, counsel. Supposing that I accept for a moment, and it seems to me you're arguing counsel's performance was below the standard that's acceptable here. Supposing that I admit that for the minute, what would be the prejudice? I mean, it's not only a defense for what you're suggesting, but it's also a defense for second-degree murder. Your client was found not guilty of second-degree murder. In fact, given the instruction that you claim is so bad, they went in, that instruction was there, stipulation was there. Nonetheless, the jury found him not guilty of second-degree murder, and the instruction was equally applicable to second-degree murder as it was to manslaughter. So what's the prejudice? I mean, they went through and weighed the evidence, it seems to me, regardless of the instruction, because they didn't find him guilty of second-degree murder. Where do we come out? What's the prejudice? First of all, I do want to, with regard to your question about your assuming for the sake of argument that it was deficient performance, it clearly was, and in fact the state has conceded that in their briefing in district court, number one. But getting to the heart of your question. I mean, I'm trying to get there, giving them a chance to argue, but I appreciate what you're saying. That's not my point. My point is, what was the prejudice? You got the instruction which, if it really went the way you said it went, then he ought to be guilty of second-degree murder as well. Second-degree murder requires the mental state of an intentional act. And in this case, this matter was, two days before trial, this matter was amended to include the charge of second-degree murder. Now, I discussed this issue at the district court level, and we requested that the court take up this matter on appeal. Although this court did not certify this issue on appeal. But the fact of the matter is, since you bring it up, is that there was zero evidence of an intentional act during the state's case-in-chief. And, in fact, the trial court judge, if you go back and look in the record, and I could find that for you in a minute, if you go back and look at the excerpts of record, the trial court judge specifically, at the end of the state's case-in-chief, on two different occasions, because there was a recess, asked trial counsel, do you have any motions you would like to bring, trial counsel? Trial counsel said no, both times. And, in fact, I think the record would show that if he had made the motion to dismiss after the state's case-in-chief, it clearly would have been granted, and that charge would not have been before the jury. In fact, the chief investigating the detective, one of the detectives in the case, that he did not believe this was an intentional act. This case, if you look at the record, it involved his sister. I mean, it was a horrible, tragic act. Counsel, what does the intent have to be under these circumstances? Clearly, I guess we believe part of the evidence. He knew it was very dangerous, and he was pulling the trigger. Now, there was other evidence he thought that the gun couldn't discharge under those circumstances. But clearly, he understood it was very dangerous, and he did pull the trigger. So I guess there are two views of intent also. Well, the issue with first-degree manslaughter and second-degree manslaughter is, in Washington, first-degree manslaughter involves a mental state of recklessness. Second-degree manslaughter involves criminal negligence. So, again, what we're stating here is that because of this excusable homicide instruction, juries are presumed. Everybody knows it's well settled that juries are presumed to follow their instructions. And that excusable homicide instruction said that the only way you can call an accident is if it's without criminal negligence. But clearly, defense counsel wanted the jury to consider second-degree manslaughter as a lesser-included offense, which requires criminal negligence. In Washington, by the way, if Joshua had been convicted of second-degree manslaughter, the standard-range sentence for that offense would have been 67 to 77 months. Being convicted of first-degree manslaughter, he was sentenced to a standard-range sentence of 175 months. There was very clear prejudice here. What do you understand was defense counsel's overall theory? What do you understand it to be? Well, I understand it to be accident. Now, I know the State specifically has argued in their briefing that it really wasn't their intent. I mean, the State was the accident was just sort of a sideline issue. That is just completely belied by the record. So defense counsel's whole approach was just this was just nothing but an accident. A tragic accident, yes. Therefore, it was excusable. Yes. And, in fact, the State has to prove the absence of excusability for any degree of homicide, beyond a reasonable doubt. And so by the defense arguing an accident, excusability, that's a defense to all – in theory, it's a defense to all three degrees of homicide. And I want to point out that defense counsel – again, the State has indicated that this was – he wasn't really arguing accident. Well, he argued it in opening statement. He said it was an accident. When he cross-examined Dr. Selov, who was the State's pathologist, he cross-examined him quite a bit about whether it was an accident. He cross-examined Stanley McGee, the State's firearms examiner, about whether it was an accident. Joshua, the defendant's own testimony at trial, was all about this was an accident, what he did, how he didn't mean to do it, and it was a tragic, tragic accident. And defense counsel, in his closing argument, spoke of accident extensively. So the idea that this somehow was not counsel's defense, quite frankly, is a strange idea. And even if it wasn't, the fact of the matter still remains that jury jurors are presumed to follow their instructions. And the State would be suggesting that a prejudicial and stirred jury instruction can't satisfy the prejudice prong under Strickland. Clearly it can't. Well, that leads me back to my question, which you answered. But my worry is that your argument, if this is your best argument, your argument is hinged on the fact that the very instruction that you suggest kills the ability of the defendant to get what he needed in this particular situation is also the very jury instruction the jury completely ignored in finding no second-degree murder. No, I don't think you have to look at it that way, Your Honor, because the evidence was so flimsy during the State's case in chief that the jury clearly was not going to find him guilty of second-degree murder. Just a minute. Counsel, this kid gave three different versions of the events leading to the death. One suggests that he called 911 and said rival gang members did it, told his sister not to hang out with him. Another suggests after he gets put right in front of the police, well, I did kill her. And now that confession is videotaped, and he starts talking about marijuana and playing the game of Russian roulette. Then at trial he gives another version. All of those three versions are in front now of the jury, and we're suggesting based on three different versions that a jury instruction, which they didn't have anything to do with when it came to the toughest crime, is now prejudicial when they come to the less tough crime. Absolutely, Your Honor, absolutely. As I indicated, there is a difference between there was hardly virtually, there was barely even a scintilla of evidence for the charge of murder in the second degree, that this was an intentional act. Defense counsel could have moved to dismiss that. He chose not to. This court did not certify that issue for appeal. So if he had, that would not have even been before the jury, and they would have been faced with the issue of manslaughter in the first degree or manslaughter in the second degree. There is a huge difference between that. See, I understand your point. It's very hard, and this is what I've been battling for six years, and I'm glad I finally have a chance to explain it in court. The fact of the matter is it's very easy to take a first blush to say, what's defense counsel, what's Mr. Romero complaining about? He wasn't found guilty of the most serious charge, second degree murder. Well, the fact of the matter is you have to move past that because there wasn't any evidence of it. He didn't move to dismiss it. It was tacked on two days before trial. Defense counsel did nothing with it, and he could have had it dismissed at the end of the state's case in chief. And so then you have to look, what's really the likelihood here of conviction? It's either first degree manslaughter or second degree manslaughter. And in this particular case, the jury had this instruction that says second degree manslaughter requires criminal negligence. But they've got a definition and a to-convict instruction, by the way, that says second degree manslaughter is committed with criminal negligence. So it would have been one thing if defense counsel didn't submit the second degree manslaughter instruction. But he did, and given the facts of this case, and he gave three. You're right, he gave three. Didn't the judge give it on his own, or did defense counsel suggest a second degree manslaughter? Defense counsel absolutely proposed it. As a lesser included offense. Yes. And that's cited in the excerpts of record. The point of the record where that is is cited in our brief. Do you want to save the rest of your time for rebuttal? Give me just about one more minute, Your Honor. I've got about four and a half. I wanted to touch briefly on the ADPA. And that is, of course, that if this Court were to find, defense counsel, find both prongs of the Strickland test were met, they would still have to find that the Washington Supreme Court's adjudication of this case resulted in a decision that was contrary to or involved in unreasonable application of fairly established Federal law as determined by the United States Supreme Court. Here, the Washington Supreme Court did not even address the issue of whether the language of the excusable homicide instruction precluded the jury from finding Joshua guilty of manslaughter in the second degree. Again, they addressed the issue of manslaughter one, but not manslaughter two. And that's what I'm trying to focus on here today. So you're really suggesting a de novo standard applies for us? I think it does apply, but I think even if it doesn't apply. But something's got to get there, because if I have to give deference to the Court, which I do, if in fact I believe they're suggesting that they understand the standard and that there is a Supreme Court standard and they lay it out as to that standard and a reasonable probability standard is the Strickland standard, if I don't find that, however, then I can go with a de novo application and I make my own decision. Otherwise, I've got to give deference to the Washington commissioner or his standard. You're absolutely correct, Your Honor, and the Court can look at it de novo. But even if the Court didn't look at it de novo, the fact of the matter is, is that the Washington Supreme Court, while there is an opinion, the specific issue of manslaughter in the second degree was not addressed. And I think that's important because the Washington Supreme Court stated that the jury likely would have found, given the evidence, that Joshua operated with a, quote, criminally culpable state of mind. But if they don't address it, isn't it true that I appropriately take a de novo standard? You certainly can, Your Honor. Isn't that the only one I can? Because then they haven't given me anything to which I have to give deference for, and therefore de novo is the appropriate standard of review. Yes, it is. You are absolutely correct. Thank you. The last thing I want to say before I reserve the last two minutes of my time is that with regard to Section 2254d-1, the Supreme Court has repeatedly stated that a federal court may grant relief when a state court has misapplied a governing legal principle to a set of facts different from those cases in which the principle was announced. We're talking United States Supreme Court Wiggins v. Smith, Lockyer v. Andrade, Williams v. Taylor, a whole host of precedent that indicate that. And I think the state's argument that because there is no United States Supreme Court case that specifically addresses this very specific fact pattern and issue, that therefore you can't get around that in making this determination as incorrect. And I'll reserve my last minute and 15 seconds. Thank you. Okay. Thank you. Good morning. May it please the Court. I'm Alex Hostin, Assistant Attorney General representing Washington Department of Corrections. The state court found Mr. Romero was not prejudiced by counsel's not investigating diminished capacity by the submission of the instruction and arguing homicide was excusable and by not interviewing Dr. Siloam. This Court should find under AFLAS 2254D deferential standard, the state court correctly applied United States Supreme Court precedent of Strickland v. Washington and objectively reasonably applied it to the facts of this case. I'd like you to address first whether the stipulation as to his prior conviction could have been excluded or should have been excluded. Your Honor, the stipulation was a part of defense's strategy. And it actually worked in this case. Well, I know that it was part of his strategy. And the question is whether it was incompetent strategy. So had he not stipulated to that, could it have been excluded? I'm not sure, Your Honor. But at this point, when we look at the case in the AFLAS, we're looking at a federal habeas case. We'll look at Strickland. And Strickland says if Mr. Romero is unable to show prejudice, he cannot show ineffectiveness. Well, I understand that principle, but I'm just a precursor. If, in fact, that couldn't have come in, it would certainly be incompetent to have stipulated to it. It would have easily come in in terms of it would have been very easy for the State to prove that Mr. Romero had two prior convictions. Well, sure. But was it admissible? I'm sure it was.  You see, that was such conviction. Excuse me, Your Honor? I said, you said, I'm sure it was, and I just said, why? What's the basis for that statement? Well, if the strategy was to have Mr. Romero testify truthfully, and that's what's the strategy was Mr. Romero is finally coming out clean, he's finally telling the truth, the State would have impeached him because burglary is a crime of dishonesty. So it would have severely undermined Mr. Romero's testimony, which was the key. Well, the fact that he was convicted of a conviction is a little different than having been convicted of a conviction, that it would then have been unlawful for him to possess a gun. Is that right? Yes. So is it clear that it would have come in? Yes, I think it would. I think it's clear. The fact that he was convicted of a prior burglary? True. Okay. Now, let's say that would come in on cross-examination if he had taken the stand, as it did. But would it also have been brought out as part of the State's case, or even on cross-examination, that it would have then been unlawful for him to possess the gun? I'm sure it would. Okay. Under Strickland, Strickland says that the purpose of the ineffectiveness claim is not to grade counsel's performance. And if the claim, if Mr. Romero is unable to show prejudice, this is the end of his claim. And his claims need to be looked at in the context. You need to look at the facts of what happened. Mr. Romero unlawfully possessed the gun. He loaded it, pulled the trigger. It didn't fire. He pointed at another human being, his sister, pulled the trigger again. He fired, killing her. On the scene, he was taking revenge. He lied to the police. He lied to the 911 operator. He hid the gun. He gave a very detailed description of the gang member coming to his house and killing his sister. And then he confessed after being properly myrandized. His mental health history does not reveal any significant mental issues. The juvenile court declination hearings that were, of course, available to the counsel indicated that he was not diagnosed as having fatal alcohol syndrome or ADD, and the state charged him with a second-degree murder. The bottom line in this case is that Mr. Romero is unable to show prejudice, first of all, because the jury acquitted him of the second-degree murder. If he was convicted of the second-degree murder, he would be potentially serving up to nine years and 11 months extra in prison compared to what he is serving now. Another reason why he cannot show prejudice is because under the facts of this case, as the state court properly found, it's extremely unlikely that the jury could have him convicted of anything less other than manslaughter one. The homicide was not excusable. He could not have been acquitted of the charges under the very difficult facts of this case for the defense. He could not have been acquitted of the charges because he unlawfully owned the gun. And he is mens rea when he unlawfully owned the gun. Even if he owned the gun and even it were illegal, you could still have an accidental death, could you not? I'm sorry, Your Honor. I didn't hear the last part. Could you still not have an accidental death even if the guy owned the gun and it was illegal for him to have it? Not under the facts of this case, Your Honor, because the gun was unloaded. He loaded it. Well, that may mean, but I thought your statement was too broad that the fact that he illegally had it done precluded him from any conviction less than first, first degree manslaughter. That's not really theoretically not accurate. No, Your Honor, I respectfully disagree because the mens rea required for manslaughter one is recklessness, which is disregarding substantial risk that in this case death will occur. And clearly that may be true in this particular case. I'm just quarreling with your broad proposition that there could be no accidental death if the gun was unlawfully possessed. Under different factual scenario, absolutely, Your Honor, but not under the facts of this particular case. Mr. Romero, Mr. Romero's counsel was not ineffective by not pursuing diminished capacity defense, as the State court properly found. Under AFIS 2254 standard, the State court identified the proper Federal constitutional law, which was Strickland v. Washington through the State case of State v. McFarland, and objectively reasonably applied it to the facts, finding no prejudice. Because the juvenile, again, Mr. Romero is unable to show prejudice in it, and this Court should find that the State court's adjudication was objectively reasonable because there are no records that indicate that he was suffering from any significant mental issues. As Strickland says, a lot of what counsel does depends on the actions of his client. And here the actions of Mr. Romero immediately after the death, he's lying to the police, hiding the gun, providing this false description, also indicates that he clearly understood what he was doing. On the stand, he actually testified that the reason why he lied was that he didn't want to be locked up, and he was afraid that his family would be mad at him. Dr. Silovo's testimony. Dr. Silovo called any death at the hands of another homicide. The defense counsel made him clarify that he was using the term homicide in a strictly forensic pathology context, and the defense counsel made him admit that he didn't even know what the legal definition was. He, Dr. Silovo wholeheartedly agreed that it was not for him but for the jury to decide whether the death was homicide in a legal sense. And again, another thing, Dr. Silovo called Russian roulette, suicide by Russian roulette reckless. However, he already ruled out suicide. That's number one. And it goes to the prejudice prong of Strickland's test. He already ruled out suicide. And number two, Mr. Romero on the stand repeatedly admitted that his earlier statements to the police about playing Russian roulette were lies. So again, it goes to the prejudice prong of Strickland where Mr. Romero is unable to show prejudice. Find the submission of the instruction and the state court adjudication of that claim on the merits. When this court looks at the defense theory at trial, it was, first of all, that Mr. Romero was not a murderer. In closing, the defense counsel was repeatedly saying that, did Joshua, did you see that Joshua was not trying to threaten Giselle? Did you see any proof that he was trying to frighten her or assault her? And that was his sort of first line of defense. And he was successful. The jury actually believed him and acquitted Mr. Romero of the second-degree murder, which again saved him from potentially serving up to ten extra years in prison. In Washington law, let's just go back to the fact that he stipulated about being unlawfully in possession of a firearm. There was a separate count, right, that he was unlawfully in possession of a firearm. So when Judge Fletcher was asking earlier on to petitioner's counsel, he could have pled guilty to that prior to trial. Is that right? Just to the firearm? Just to the firearm charge. I'm not sure, Your Honor, under the facts of this case, whether he could have pled guilty to that prior to trial. Why can't a defendant just right before trial say, Your Honor, I want to plead guilty to count three or count two? Take that off the table. Well, I'm not sure. Isn't that an absolute right? He probably could have. I'd be surprised if he couldn't have. Well, then the judge would not accept it. Right. That count would have been established by his guilty plea. Yes, but there was still a second-degree murder charge, which counsel was successful in. Okay. So there was this stipulation that he was in unlawful possession of the gun because he had committed a serious felony in the past. Yes. All right. So Judge Fletcher's question was, he not stipulated to that fact, and I'll add to it, and if he had pled guilty to the gun charge, why is it so certain that the jury would have learned that he would have been in unlawful possession of the gun? What is it about the story or about the State's case that that would have come out irrespective? Well, there was a lot of prior criminal activity by Mr. Romero. I'm sure the State would have been able to bring his prior criminal activity up. But, again, Your Honor, we're going back to the prejudice prong. How was he prejudiced? Well, you say he's not prejudiced because the jury found him not guilty of the second-degree murder charge. Not only because of that, Your Honor. The other reason is, under the facts of this case, it's extremely unlikely that the jury would have him convicted. So it's not applying the prejudice prong of Strickland, reasonable probability. It's not in light of the facts here. And as Judge Smith went through his various versions about what happened here, if you take the evidence in light most favorable to the jury found, it's not reasonably probable under these facts that they would have come out with a different outcome. Yes, Your Honor. Is that right? Does that have the argument? That's right, Your Honor. Anything less than manslaughter one conviction would be extremely unlikely. All right. Refresh me, counsel, as to what issues we certified for appeal. Failure to interview Dr. Sloan, failure to raise diminished capacity defense, and presentation of the excusable homicide instruction. Did we have the issue of failure to have a hearing? No. No, it was not certified. I thought we did have the failure to have a hearing by the district judge on this particular situation. No, I don't believe so, Your Honor. I think the only three claims, and I think I'm remembered well, ineffectiveness claims, failure to present diminished capacity instruction, and failure to interview. Well, I have one last, just a procedural question I was just interested in. Whatever was the trial counsel, his trial counsel ever interviewed, or did he ever supply a declaration, or was he ever deposed, or anything like that? No, Your Honor, I don't believe so. Was there any attempt made to do that? Sometimes when I'm working in habeas corpus, I try to do that. To be honest with you, it's been several years. I usually try when there are allegations of ineffectiveness, but sometimes counsel refused. But to be honest with you, I don't honestly remember. What happened here? Whether I tried or not in this particular case. Does this Court have any other questions? No. The State specifically requests this Court to uphold the district court's denial of Mr. Romero's habeas corpus petition. Thank you. I have less than a minute and a half, so I just would like to touch on a couple points very quickly. First of all, we requested an evidentiary hearing, both the State court and district court level denied. Was that certified to us? I'm sorry? Was that issue certified to us? It was not. It was not certified. However, on this particular issue that I've tried to focus on here, on the excusable homicide instruction, I think this Court can clearly reverse the district court without an evidentiary hearing because the State has essentially conceded, has conceded, that the proposal of this instruction was deficient in performance. And it clearly was. The issue of trial counsel being interviewed, we would have loved to have interviewed him. We were not allowed to do it by the State court. The issue that Judge Fletcher has had concerns. Did you ask the federal court? Oh, absolutely. Denied. Did the district court judge say no? Absolutely. Absolutely. Judge Fletcher asked about the issue of did the jury need to hear about the gun if he pled guilty? Well, again, there are other ways it could have been kept out. Perhaps it would have come in as an unnamed felony, which State law allows while he's testifying to impeach him, but they wouldn't have said anything about it being a gun. And I think that's my time. Thank you. We'd ask the court to reverse the district court and grant the writ. Thank you. Thank you. We appreciate counsel's argument in this case, and we will submit it for decision.
judges: B. Fletcher, Paez, N. R. Smith